## STATE ex rel. SHORT v. STATE BOARD OF EQUALIZATION et al.

No. 15454—Opinion Filed Sept. 9, 1924.

Rehearing Denied Nov. 12, 1924.

(Syllabus.)

1. **Constitutional Law—Amendments—Submission to Vote of People.**

Section 1 of article 24 of the Constitution of Oklahoma provides: "Any amendment or amendments to this Constitution may be proposed in either branch of the Legislature, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered in their journals, and referred by the Secretary of State to the people, for their approval or rejection, at the next regular general election, except when the Legislature, by a two-thirds vote of each house, shall order a special election for that purpose. If a majority of all the electors voting at such election, shall vote in favor of any amendment thereto, it shall thereby become a part of this Constitution."

Held, that, under this provision, the exception clause, which reads, "except when the Legislature, by a two-thirds vote of each house, shall order a special election for that purpose," means two-thirds vote of all the members elected to and constituting each house.

2. **Same—Special Election—Invalidity of Submission.**

By House Concurrent Resolution No. 18, of the Ninth Legislature of Oklahoma, an amendment was proposed to section 9 of art. 10 of the Constitution. A majority of the members elected to and constituting each house of the Legislature agreed to this amendment, but two-thirds of all persons elected to and constituting each house did not order the same submitted at a special election. It being conceded that the election held October 2, 1923, at which this amendment was submitted, was a special election, there was no authority of law for submitting the amendment at said election, and the affirmative vote thereon by a majority of those voting at said election, gives the same no legal force and effect.

Original action for injunction by the State, on the relation of George F. Short, against the State Board of Equalization and the members thereof. Writ granted.

George F. Short. Atty. Gen. and John Barry, Asst. Atty. Gen., for plaintiff.

Wm. T. Holloway, McPherren & Wilson, Anglea & Crabb, for defendants.

BRANSON, J. By permission of this court, on an application to invoke its or-

iginal jurisdiction, this action was filed in the name of the state, on the relation of the Attorney General, against the State Board of Equalization, and the individual state officers composing the same. A proper understanding of the issues suggests that the petition be quoted in full herein, and it is as follows, to wit:

"Comes now the state of Oklahoma and for cause of action against the above named defendants alleges and states that this action is brought in the name of the state of Oklahoma on the relation of George F. Short, Attorney General of the state of Oklahoma, in compliance with and pursuant to Senate Concurrent Resolution No. 13, passed by the Senate and the House of Representatives on the 15th day of March, 1924, while the Second Extraordinary Session of the Ninth Legislature was in session. That under and by the terms of said concurrent resolution, George F. Short, as Attorney General, was directed, empowered, and authorized to institute this action.

"That of the above named defendants, M. E. Trapp is the Acting Governor of the state of Oklahoma, that C. C. Childers is the State Auditor of Oklahoma, that A. S. J. Shaw is State Treasurer of Oklahoma, that R. A. Sneed is Secretary of State of Oklahoma, that George F. Short is Attorney General of the state of Oklahoma, that Fred Parkinson is State Examiner and Inspector and that J. A. Whitehurst is President of the State Board of Agriculture, and that by reason of being such officers, the said defendants constitute and comprise the State Board of Equalization of the state of Oklahoma, and that this action is brought against the said defendants as members of and constituting the State Board of Equalization.

"That the Ninth regular session of the Legislature of the state of Oklahoma did on the 31st day of March, 1923, pass House Concurrent Resolution No. 18, same being in words and figures as follows:

" 'House Concurrent Resolution No. 18
" 'Amendment to Constitution

" 'A Resolution authorizing the submission of a proposed amendment to the Constitution to the people for their approval or rejection, for the purpose of amending section 9 of article 10, providing for a special state levy for public schools.

" 'Be It Resolved By the Senate and the House of Representatives of the Ninth Legislature of the State of Oklahoma in Regular Session Assembled:

" 'That the State Election Board is hereby instructed to prepare and submit to the voters of this state for their adoption or rejection at the next general or special election the following proposed amendment to section 9, article 10, of the Constitution

of the state of Oklahoma to read as follows:

" 'Amendment.

" 'Section 9. Except as herein otherwise provided, the total taxes, on an ad valorem basis, for all purposes, state, county, township, city or town, and the school district taxes, shall not exceed in any one year thirty-one and one-half (31½) mills on the dollar, to be divided as follows:

" 'State levy, not more than three and one-half mills; county levy, not more than eight mills; provided, that any county may levy not exceeding two mills additional for aid to the common schools of the county, and the aid to said common schools shall be apportioned as provided by law; township levy, not more than five mills; city or town levy, not more than ten mills; school district levy not more than five (5) mills on the dollar for school district purposes, for support of common schools. Provided, that the aforesaid annual rate for school purposes may be increased by any school district by an amount not to exceed ten mills on the dollar valuation, on condition that a majority of the voters thereof voting at an election vote for said increase.

" 'Provided, further, that a state levy, on an ad valorem basis, sufficient to provide for a fund equal to at least fifteen dollars ($15.00) per child per annum in average daily attendance shall be made by the State Board of Equalization, and the total taxes for all purposes and maximum state levy of three and one-half (3½) mills may be exceeded for this purpose only. From the fund there shall be annually apportioned by the State Treasurer to the various counties upon recommendation of the State Superintendent as to attendance, a sum equal to fifteen dollars ($15.00) per child in average daily attendance during the preceding fiscal year and the county treasurer shall apportion this fund to the several districts on the same basis. No money shall ever be appropriated out of this fund for any other purpose.'

"That thereafter and on the 13th day of August, 1923, Honorable J. C. Walton, as Governor of the state of Oklahoma, did issue his proclamation calling a special election to be had and held throughout the state on the above proposed constitutional amendment, together with four other proposed amendments, said election to be had and held on the 2nd day of October, 1923. That thereafter on the 16th day of September, 1923, there was filed in the district court of Oklahoma county a petition and application for writ of injunction against W. C. McAlister, as Secretary of the State Election Board, seeking to enjoin the said W. C. McAlister and other members of the State Election Board from submitting said proposed constitutional amendment at

said election and enjoining the members of the State Election Board from taking any step, performing any act, and incurring any expense under and pursuant to the proclamation of the Governor. That on the 18th day of September, 1923, a district judge of Oklahoma county granted his writ of injunction, restraining and enjoining the said W. C. McAlister, Secretary of the Election Board, and all other members of the Election Board, from proceeding further with the preparation or submission of said proposed constitutional amendments under said proclamation of the Governor. From said judgment an appeal was taken to the Supreme Court of the state of Oklahoma and on the 27th day of September, 1923, the Supreme Court reversed the decision rendered by the district court of Oklahoma county and vacated the writ of injunction granted. That the mandate from the Supreme Court of the state of Oklahoma was handed down and reached the clerk of the district court of Oklahoma on the 29th day of September, 1923. That by reason of said injunction suit the Secretary of the State Election Board and the other members of the election board were prevented from publishing the said proposed constitutional amendment in the newspapers in every county in the state as by law is required. That by reason of said injunction no arguments pro and con were secured, submitted, or prepared for and against each measure to be submitted as is required under the provision of section 6638, Compiled Oklahoma Statutes, 1921; that on the 1st day of October, 1923, J. C. Walton, as Governor of the state of Oklahoma, issued his proclamation recalling said election on account of failure of the proper officers to properly advertise, notice, and publish and furnish arguments on the question. That there was no publication, no notices, no printing of arguments pro and con on said various measures, and that the registration books were not opened to permit the voters who had become eligible to vote since the last registration. That notwithstanding such facts there was held on the 2nd day of October, 1923, a special election throughout the state with the exception of Texas, Beaver, and Cimarron counties, and said proposed constitutional amendments were voted on at said election so had and held and that this proposed constitutional amendment did receive 144,768 votes in support of the same and 116,711 votes against the same; that at said election there were 289,100 votes cast, thereby upon the face of returns indicating that said proposed constitutional amendment had carried and had been adopted. That said proposed constitutional amendment authorized a state levy creating a fund equal to $15 per child in average daily school attendance during each preceding school year, to be computed and made by the State Board of Equalization, and did attempt to authorize the payment of the amount of

money so raised. That during the preceding scholastic year there was approximately 450,000 school children average daily attendance within the state of Oklahoma; that $15 per child would amount to $6,750,000; that such sum the said board of equalization might levy under the terms of the constitutional amendment if same is valid. That the State Board of Equalization and the above named defendants constituting the members of the State Board of Equalization have met and did on the 2nd day of June, 1924, by resolution, authorize and direct a levy of $15 per capita for the number of children in average daily attendance in the state of Oklahoma during the preceding scholastic year, and that the said State Board of Equalization and the defendants are threatening to, and will proceed to cause the levy to be made and enforced to raise the sum of approximately $6,000,000 unless restrained and enjoined by the order of this court. That the said proposed constitutional amendment, by reason of the foregoing facts, was not submitted in accordance with law, was not properly noticed, that no arguments pro and con were submitted and that as a result of the total failure to notice, to publish, to permit the filing and publishing of arguments pro and con, the certificate of the Secretary of the State Election Board, showing that said proposed constitutional amendment did in fact carry, is invalid and void, and the said act is invalid and void and that the State Board of Equalization is without authority of law to make said levy. That the proposed constitutional amendment did not pass by a vote of two-thirds majority of each house. That there was not, by a vote of two-thirds majority of each house of the Legislature, a special election ordered, called, or authorized to be called for the purpose of submitting said measure.

"That at the regular election held in the state of Oklahoma in November, 1922, there were 487,616 votes cast, and that the voters attending and voting for said special election on October 2, 1923, was not a fair representation and did not constitute the will or the voice of the suffrage of the state of Oklahoma.

"Wherefore, plaintiff prays that the defendants and each of them be enjoined from causing a levy to be made under and by virtue of the proposed constitutional amendment and said amendment to be declared void, and for such other and further relief as to the court may seem meet and just.

"George F. Short,
"Attorney General.
"John Barry,
"Assistant Attorney General."

Stipulated to be considered, as part of the petition, in determining the demurrer, it is agreed that the House and Senate

Journals correctly disclose the vote taken on the five certain proposed constitutional amendments, submitted October 2, 1923, that the court shall take judicial notice of all proclamations or actions by the Governor of the state of Oklahoma, touching said amendments so proposed by the Ninth Legislature in its regular biennial session, that affect in any wise the amendment in question, or the legality of the election held October 2, 1923, and that the court shall take judicial notice of the House and Senate Journals embracing said proposed amendments; that the facts relative to the publication of notice and as to publicity given in newspapers and otherwise as to the character, nature, and effect of the amendment in question shall be considered as disclosed by an exhibit attached to the stipulation (which discloses various newspaper publications for and against the proposed amendment) and may be considered in the determination of the questions of law raised.

To the petition as so supplemented, the defendants as a board, and as officers composing the board, have interposed a demurrer in its nature both general and special, and the issues involved herein are thereon submitted for determination.

The Ninth biennial session of the Legislature agreed to certain proposed amendments to the Constitution of the state, five in number. A further review of the facts as to same, permissible under the stipulation, supra, is not amiss.

August 13, 1923, the Governor issued what was denominated his proclamation, reciting the fact that certain resolutions had been passed by the Legislature set out in the proclamation, and among them was

"An amendment to the Constitution providing a special state levy for public schools, being an amendment to section 9 of article 10 of the Constitution; said amendment providing the total ad valorem taxes for state, county, township, city, etc."

—known as the School Amendment, and which is in words and figures as follows, to wit:

"House Concurrent Resolution No. 18.
"Amendment to Constitution.

"A resolution authorizing the submission of a proposed amendment to the Constitution to the people for their approval or rejection, for the purpose of amending section 9 of article 10, providing for a special state levy for public schools.

"Be it Resolved by the Senate and the House of Representatives of the Ninth Legislature of the State of Oklahoma in Regular Session Assembled:

"That the State Election Board is hereby instructed to prepare and submit to the voters of this state for their adoption or rejection at the next general or special election the following proposed amendment to section 9, article 10, of the Constitution of the state of Oklahoma to read as follows:

"Amendment.

"Section 9. Except as herein otherwise provided, the total taxes, on an ad valorem basis, for all purposes, state, county, township, city or town, and the school district taxes, shall not exceed in any one year thirty-one and one-half (31½) mills on the dollar, to be divided as follows:

"State levy, not more than three and one-half mills; county levy, not more than eight mills; provided that any county may levy not exceeding two mills additional for aid to the common schools of the county, and the aid to said common schools shall be apportioned as provided by law; township levy, not more than five mills; city or town levy, not more than ten mills; school district levy, not more than five (5) mills on the dollar for school district purposes, for support of common schools. Provided, that the aforesaid annual rate for school purposes may be increased by any school district by an amount not to exceed ten mills on the dollar valuation, on condition that a majority of the voters thereof voting at an election vote for said increase.

"Provided, further, that a state levy, on an ad valorem basis, sufficient to provide for a fund equal to at least fifteen dollars ($15.00) per child per annum in average daily attendance shall be made by the State Board of Equalization, and the total taxes for all purposes and maximum state levy of three and one-half (3½) mills may be exceeded for this purpose only. From the fund there shall be annually apportioned by the State Treasurer to the various counties upon recommendation of the State Superintendent as to attendance, a sum equal to fifteen dollars ($15.00) per child in average daily attendance during the preceding fiscal year, and the county treasurer shall apportion this fund to the several districts on the same basis. No money shall ever be appropriated out of this fund for other purpose." Laws 1923, c. 288.

After the promulgation of said proclamation, the Chief Executive directed the Attorney General to seek an injunction in the district court of Oklahoma county, against the State Election Board, enjoining the holding of the election, the thing his proclamation had called upon the Election Board to do. An injunction was issued in the district court of Oklahoma county, and an appeal therefrom taken by the Election Board to this court, and the action of this court thereon is shown in the case of McAlister et al. v. State ex rel. Short, 95

Okla. 200, 219 Pac. 134. Said case also sets out the other said amendments. Thereafter the Governor, on the 1st day of October, 1923, issued his proclamation, undertaking to revoke and recall his proclamation of August 13th, and under these conditions the election was held the 2nd day of October.

The difficulty of maintaining the public schools in certain sections of the state, to that degree of efficiency necessary to give the children in all the school districts as nearly equal educational advantages as were possible, no doubt prompted the Legislature in submitting the proposed amendment. Perhaps few could find great fault with the intended policy of the Legislature in offering such an amendment to the Constitution of the state, except in the fact that there was no accompanying legislation requiring the reduction of the school district levies for receipts of such an amount from the state levy. That was left unchanged so the officers could levy the same amount, if they saw fit.

But as to the policy of the legislation, or rather the proposed constitutional amendment, the court has nothing to do. The Legislature no doubt felt that it was one of the primary duties of the state, as far as possible, to extend to those within the public school age the advantages which it deemed might come from a uniform and fixed tax levy, for the support of public schools, based upon the average daily attendance in each district. But the question raised by the petition and the demurrer is purely one of law, and it is one which the court must pass upon without bias, although its members cannot be unaware that yielding to the cry for monumentally more than the public is able to pay is ruinous to the welfare of the people.

It has been well said:

"No feature of the judicial function is of equal dignity with that which requires dealing with what is and what is not really a part of the Constitution, or those things which may have been engrafted upon the original instrument. None requires an equal degree of care to reach a right conclusion, and courage to pronounce it. The court may, and should, and must, on such great occasions, look to the effects and consequences. Not to do so with the thought of hesitation, much less omission to do what duty to the public requires; but as an inspiration to reach the highest attainable degree of certainty of the right being vindicated in the end."

Again it is well said:

"The people through their chosen instrumentalities, and by subsequent direct approval, created the Constitution. It was wisely conceived to be as necessary to the conservation of inherent rights as those rights are to a worth while existence. In their wisdom, it was thought that it was of as much importance to have a delegated guardian to expound, apply, defend and preserve their creation—one independent of any other power but that of the creator, exerted in the particular way provided, one as high up as possible above danger of being 'swayed by fear, favor, affection or hope of reward, by personal influence or public opinion,— as to have such creation, itself. They made a Supreme Court to be such guardian, and provided for instrumentalities answerable only, except in a very narrow degree, to the sovereign—the people.

"So it happens that, upon being properly interrogated on the subject, it is as much the duty of this court, even after a proposed amendment to the Constitution shall have apparently traversed the entire course from initiation to official publication as the law, and have been indorsed by a majority of the people, however large, to give judicial answer thereto of approval or nullification according to the facts. * * *

"It must be presumed that every feature of the grant of power to the Legislature to propose amendments to the Constitution was deemed by the people in making such grant to be material, and neither Legislature nor the court has jurisdiction to ignore it. * * *

"When the existing Constitution prescribes a method for its own amendment, an amendment thereto, to be valid, must be adopted in strict conformity to that method; and it is the duty of courts * * * to inquire whether, in the adoption of the amendment, the provisions of the existing Constitution have been observed, and if not, to declare the amendment invalid and of no effect.' * * *

"Thus, we reiterate, it happens that the people, themselves, have no authority to pass upon the question of whether a legislative proposal shall be written into the fundamental law, unless it shall have been submitted to them in the manner they prescribed, in exercise of their original right to create a form of government. It follows, logically, that it is of no avail for the people by their votes to approve a proposed change of the Constitution, if it shall not have been submitted in such manner as they in their sovereign authority provided. Otherwise such approval, however emphatically pronounced, does not authorize writing the proposition into the basic law." (State ex rel. Postel v. Marcues [Wis.] 152 N. W. 419.)

This suit by the Attorney General, in the name of the state, was instituted, not on his own volition, but on direction of the legislative branch of the state government, for that the Ninth Legislature, in its Second Extraordinary Session, passed Senate Con-

current Resolution No. 13 (Session Laws Okla. 1923-24, chapter 157, page 219), which resolution was passed long after the election of October 2, 1923, and, omitting certain portions thereof, is in words and figures as follows, to wit:

"Whereas, chapter 288, Session Laws of Oklahoma, 1923, known as House Concurrent Resolution No. 18, authorized and instructed the State Election Board to prepare and submit to the voters of the state of Oklahoma for their adoption or rejection the proposed amendment to article 10, section 9, of the Constitution; and

"Whereas, the amendment proposed by said House Concurrent Resolution No. 18 was submitted at the special election held on the 2nd day of October, 1923, and the tabulated returns of said election disclose that said measure received a majority of the votes cast; and

"Whereas, the validity of said amendment may be called into question and in the event of the invalidity of the same, the amendment cannot be again submitted to the voters of the state until said amendment is declared invalid:

"Now, Therefore, Be it Resolved by the Senate and House of Representatives:

"That the Attorney General be and he is hereby authorized and directed to bring and institute civil action to test the validity of the above mentioned constitutional amendment, and in the event of the invalidity of said amendment to institute proper civil action in the courts of this state to cause to be submitted in conformity with the election laws of this state, this amendment as was proposed in Resolution 18, Session Laws, at the next general or special election held throughout the state."

The conclusion is inevitable that there was in the mind of the legislative branch of the state government a feeling that the amendment theretofore submitted by the same Legislature in its regular session had not been placed before the people as provided by the Constitution, and in order that the matter might be determined, directed that this suit be instituted.

The Attorney General contends that the Constitution can only be amended in strict conformity to the grant of power contained within the Constitution itself. And in this contention he is supported by authority. City of Chicago v. Reeves (Ill.) 77 N. E. 237; Warfield v. Vandever (Md.) 60 Atl. 538; Commonwealth v. Bowman (Ky.) 231 S. W. 35; Sims v. Sawyer (W. Va.) 101 S. E. 467; Johnson v. Craft (Ala.) 87 South. 375; State v. Donald (Wis.) 151 N. W. 331.

In the case of Crawford v. Gilchrist, 32 Ann. Cases, 1914B, page 916, the Supreme Court of Florida stated the contention thus:

"If essential mandatory provisions of the organic law are ignored in amending the Constitution, it violates the right of all the people of the state to government regulated by law."

This court has stated the contention in this way:

"Where the Constitution confers the power to do a particular act, and prescribes the means and manner of doing such act, such means or manner is exclusive of all others." (Sapulpa v. Land, 101 Okla. 22, 223 Pac. 640.)

With these general observations lying at the basis of the main contention made by the plaintiff, we pass to the provision of the Oklahoma Constitution authorizing its amendment. But before doing so, it should be stated that it is pleaded and conceded that the resolution proposing the amendment in question, known as the School Amendment, received a majority of all members elected to both the Senate and the House of Representatives, but that two-thirds of the entire membership elected to the House of Representatives did not vote for the amendment in question.

That portion of the Constitution of the state which prescribes the method sought to be followed in the instant case is article 24, section 1, and reads as follows:

"Any amendment or amendments to this Constitution may be proposed in either branch of the Legislature, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall with the yeas and nays thereon be entered in their journals, and referred by the Secretary of the State to the people for their approval or rejection, at the next regular general election, except when the Legislature, by a two-thirds vote of each house, shall order a special election for that purpose. If a majority of all the electors voting at such election shall vote in favor of any amendment thereto, it shall thereby become a part of this Constitution."

The contention made on behalf of the defendants, and urged by an ingenious argument on the part of counsel, is that, although the election held October 2nd was a special election, and not a general election, the amendment in question was properly submitted at said election, for that, although it did not have two-thirds of the members elected to both houses, the amendment did have two-thirds of a quorum, and that part of said constitutional provision which reads, "except when the Legislature

by a two-thirds vote of each house shall order a special election for that purpose," is fully satisfied thereby.

Many cases are cited by counsel for defendants construing the language of constitutional provisions similar to the exception clause, supra, which they argue sustain their position. But counsel for defendants cite no case holding to that effect where the two-thirds required is accompanied by a context or a provision to the same import as that found in article 24, sec. 1, of our Constitution. The cases cited would lend great support to the contention made by counsel for defendants, if the two-thirds provision clause found in said constitutional provision stood alone. But it does not. On the contrary, we find it joined in the same sentence with the previous clear declaration that a majority of all members elected to each house must agree on a proposed amendment before any amendment can be submitted,—in which event, it must be submitted by the Secretary of State to the people for adoption or rejection at a general election. And immediately upon this part of the sentence comes the exception clause, which reads: "Except when the Legislature, by a two-thirds vote of each house, shall order a special election for that purpose."

The Senate is composed of 44 members; the House of 109 members. By the first provision of said section 1, art. 24, it requires 23 members of the Senate and 55 members of the House, agreeing and voting affirmatively, for a proposed constitutional amendment, to submit such amendment at all—even at a regular general election, required to be held by law. Twenty-three members are a quorum of the Senate. Fifty-five members are a quorum of the House.

The contention made on behalf of the defendants is, in the concrete, that while it takes 23 members of the Senate and 55 in the House, agreeing and voting affirmatively, for a proposed constitutional amendment to submit same, two-thirds of 23, or 16 Senators, and two-thirds of 55, or 37 members of the House, by voting affirmatively, can require that a special election be called on such proposed amendment. We think this contention is not in keeping with the intent of the Constitution makers, as disclosed by the context of the provision in question. The whole sentence, taken together, shows that "house," as used in the exception clause, means the same as that given it by the preceding clause of the same sentence, wherein it is specifically provided "All members elected to each house." For in the first part of the sentence it

says: "If the same shall be agreed to by a majority of all the members elected to each of the two houses, it shall be referred," etc. The "house" referred to in the first part is made to mean all members elected to each, and it could not have had a less meaning in the exception thereto. Under the first clause, it takes 50 per cent. plus 1 of all members of both houses agreeing. Under the exception clause, it requires two-thirds of all members to demand that the amendment be submitted at a special election. Surely it cannot be imputed to the drafters of these constitutional provisions that they intended to require a less vote to order a special election on a constitutional amendment, accompanied by expenditure of large sums of public money, than was required to submit the amendment at a general election, where no extra expense is required. Such intent is not found by a fair reading of the constitutional provision, and the court refuses to amend the Constitution created by the people themselves. That is for them to do, in the exact manner they reserve the right to make amendments.

We have read each provision of article 5 of the Constitution, which deals with the legislative department, and we find that section 34 of art. 5 provides that no bill can be passed, except by an affirmative vote of a majority of all members elected to each house. Section 58 of art. 5 provides that no bill shall take effect until 90 days after the adjournment of the session at which it is passed. except it be so directed by a vote of two-thirds of all members elected to each house. We find in said article 5 no provision that two-thirds of a quorum voting affirmatively can do any act, save and except section 35, providing for the reading at length of proposed bills. It is provided therein that the reading at length may be dispensed with by a two-thirds vote of a quorum present, and this is the only provision found in the Constitution of this state that authorizes two-thirds of a quorum to take any affirmative action. We think this condition found in other provisions governing the legislative department, together with the context of the particular constitutional provision here involved, is conclusively persuasive that the contention made by the defendants cannot be sustained.

"The courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of the Constitution. Constitutions do not usually undertake to prescribe mere rules of pro-

ceeding except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised." (Cooley, Const. Lim. [7th Ed.] 114.)

The Constitution prescribes the method by which it may be amended, and the procedure so prescribed is the measure of the power to amend. The provisions of the Constitution for its own amendment are mandatory and binding, not only upon the Legislative Assembly, but also upon all the people as well; and, consequently, a failure to observe the mandates of the Constitution is fatal to a proposed amendment, even though the electors have with practical unanimity voted for it. (Kadderly v. Portland, 44 Ore. 118, 135, 74 Pac. 710, 75 Pac. 222.)

The court has not been permitted to be unmindful of the zeal of many of the good citizens of this state to have this election on this proposed constitutional amendment sustained, but all such citizens must know that a policy of judicial evasion of the provisions of the Constitution of the state must have a tendency to destroy the instrument as adopted by the people, and that the court must refuse to do so, even in the interest of a popular decision. However properly a feeling of reluctance may be permitted to accompany the conclusion we are forced to reach herein, we must find that there was and is no authority in the Constitution and laws of Oklahoma for the submission of this amendment at a special election. The embodiment in the provision of the Legislature proposing the amendment that it shall be submitted at the next general election, or at any special election, is purely surplusage, for the constitutional provision, supra, which rises superior to all attempted legislative enactment, expressly provides how such an amendment agreed to shall be submitted to the people, and that is, omitting the exception, where a majority of each house agrees to an amendment. it shall be referred at a general election by the Secretary of State.

The demurrer interposed to plaintiff's petition is overruled. Let the writ prayed issue.

JOHNSON, C. J., and McNEILL, NICHOLSON, HARRISON, WARREN, and GORDON, JJ., concur.