No. 12309

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

--------------------

THE STATE OF MONTANA ex rel. WILLIAM F. CASHMORE, M.D., and
STANLEY C. BURGER,

Relator,

-vs-

FORREST H. ANDERSON, as GOVERNOR OF THE STATE OF MONTANA,

Respondent.

--------------------

Original Proceedings.

Counsel of Record:

For Relators:

Paul T. Keller argued, Helena, Montana.
Paul T. Keller, Paul F. Reynolds, Charles E. Petaja
and P. Keith Keller, Helena, Montana.
Morrow, Nash and Sedivy, Bozeman, Montana.
Edmund P. Sedivy argued, Bozeman, Montana.

Intervenors:

Douglas Freeman argued, Hardin, Montana.
R. F. Hibbs argued, Billings, Montana.

For Respondent:

Forrest H. Anderson, Governor, Helena, Montana.
Robert L. Woodahl, Attorney General, Helena, Montana.
Charles C. Lovell, Assistant Attorney General, Great Falls,
Montana, argued.
William Jensen argued, Assistant Attorney General, Helena,
Montana.

Intervenors:

Eugene H. Mahoney argued, Thompson Falls, Montana.
Randall Swanberg argued, Great Falls, Montana.
James E. Murphy argued, Kalispell, Montana.

Amicus Curiae:

John A. Layne III argued, Helena, Montana.

_____

Submitted: July 17, 1972

Decided: AUG 1 8 1972

Filed: AUG 1 8 1972

Thomas J. Kearney
Clerk

Mr. Justice Frank I. Haswell delivered the Opinion of the Court.

This original proceeding seeks a judicial determination by this Court whether the proposed 1972 Montana Constitution was approved and adopted by the electors at the special election of June 6, 1972.

The essential facts are undisputed. The 1969 Montana Legislature provided for a referendum election on the calling of a constitutional convention. Article XIX, Section 8, Montana Constitution; Chapter 65, Session Laws 1969. This election was held on November 3, 1970, at which time the electors approved the calling of a constitutional convention to revise, alter, or amend the present Montana Constitution. Thereafter, the 1971 Legislature enacted the necessary enabling act for such constitutional convention. Chapter 1, Extraordinary Session Laws 1971. The delegates to the constitutional convention were duly elected at the election held on November 2, 1971. The convention convened, held hearings, debated, and eventually agreed upon a proposed 1972 Constitution to be submitted to the electors for their approval or rejection at a special election to be held in conjunction with the primary election on June 6, 1972.

The separate constitutional election ballot is herewith set forth:

# OFFICIAL BALLOT
## PROPOSED CONSTITUTION
### PLEASE VOTE ON ALL FOUR ISSUES

**1.**
(Vote for One)

☐ **FOR** the proposed Constitution.

☐ **AGAINST** the proposed Constitution.

> The proposed Constitution will include a bicameral (2 houses) legislature unless a majority of those voting in this election vote for a unicameral (1 house) legislature in Issue 2.

**2.**
(Vote for One)

☐ 2A. **FOR** a unicameral (1 house) legislature.

☐ 2B. **FOR** a bicameral (2 houses) legislature.

**3.**
(Vote for One)

☐ 3A. **FOR** allowing the people or the legislature to authorize gambling.

☐ 3B. **AGAINST** allowing the people or the legislature to authorize gambling.

**4.**
(Vote for One)

☐ 4A. **FOR** the death penalty.

☐ 4B. **AGAINST** the death penalty. *II*

Following the election, the election returns were canvassed by the state canvassing board and the results of that canvass were contained in a certificate of the abstract of the votes by the Secretary of State as follows:

| | | |
|---|---|---|
| "FOR the proposed Constitution. | | 116,415 |
| "AGAINST the proposed Constitution. | | 113,883 |
| "2A. | FOR a unicameral (1 house) legislature | 95,259 |
| "2B. | FOR a bicameral (2 houses) legislature | 122,425 |
| "3A. | FOR allowing the people or the legislature to authorize gambling. | 139,382 |
| "3B. | AGAINST allowing the people or the legislature to authorize gambling. | 88,743 |
| "4A | FOR the death penalty. | 147,023 |
| "4B | AGAINST the death penalty. | 77,733 |
| "Total number of electors voting. | | 237,600" |

Thereupon the Governor proclaimed the proposed 1972 Montana Constitution approved and adopted.

Relators filed the instant action as an original proceeding in this Court seeking a declaratory judgment that the proposed 1972 Montana Constitution was not ratified and adopted because it was not "approved by a majority of the electors voting at the election" as required by Article XIX, Section 8 of the present Montana Constitution. Relators also sought appropriate remedial writs ancillary thereto. The Governor was named as sole defendant in relators' action.

This Court accepted original jurisdiction, ordered the separate actions filed by the two relators consolidated, and set the consolidated action for adversary hearing. Prior to the hearing an answer was filed by the Governor, a complaint in intervention was filed by six individuals, the Attorney General intervened as an additional respondent and filed a separate answer, and answers were filed to intervenors' complaint. In all,

- 4 -

twenty written briefs were filed by the parties, intervenors, and amici curiae. Oral argument was heard on behalf of all interested parties, including amici curiae. This case was exhaustively briefed and argued.

The ultimate issue for determination can be simply stated: Was the proposed 1972 Montana Constitution "approved by a majority of the electors voting at the election" of June 6, 1972, as required by Article XIX, Section 8, of the present Montana Constitution?

The principal contentions of relators and others who contend the proposed 1972 Montana Constitution did not receive the required majority approval can be summarized in this manner: They contend the phrase "approved by a majority of the electors voting at the election" as provided in Article XIX, Section 8, of the present Montana Constitution means a majority of the electors who cast a valid ballot on any of the four questions on the ballot; that the quoted language speaks for itself and there is nothing for this Court to construe; that the legislature, the constitutional convention commission, and the constitutional convention itself all understood what the constitutional language meant as evidenced by their official acts; and their own interpretation can not be changed now after the election has been held and the vote has become known. They also point out that the Secretary of State's certification of 237,600 as the total number of electors voting is presumptively correct by statute and as there is nothing to indicate such figure is incorrect, the presumption controls. They conclude that because the provisions of the present Constitution on determining approval or rejection of the proposed constitution are mandatory and exclusive, and because 237,600 electors voted at the election and less than half of that number (116,415) voted for the proposed 1972 Constitution, it lacked the required majority approval to take effect.

- 5 -

On the other hand, the basic thrust of respondents and those who contend the proposed 1972 Constitution received the required majority approval and became effective according to its provisions can be summarized in these words: They take the position that the phrase "approved by a majority of the electors voting at the election" means a majority of electors voting on approval or rejection of the proposed 1972 Constitution, and does not include the electors voting only on one or more of the alternative proposals.

Respondents argue that there is no valid basis for considering nonvotes on approval or rejection of the proposed constitution as votes against its approval, which would be the effect of including as part of the required majority those ballots containing a vote on one or more of the alternative questions which did not contain a vote "for" or "against" the proposed Constitution itself. They contend the figure of 237,600 represented as the total number of electors voting in the Secretary of State's certificate is incorrect; that in fact it represents the total number of ballots issued which includes blank ballots, totally void ballots, partially void ballots, and the like; that such ballots cannot be counted in determining the total number of electors voting at the election in computing the required majority vote, but only valid ballots cast can be counted. The Attorney General alternatively argues that if the required majority means a majority of the electors voting on any of the four issues, then the evidence before this Court is insufficient to make that determination; or this Court should use the issue receiving the largest number of votes (the approval or rejection of the proposed constitution) as a basis for determining the necessary majority; or otherwise those voting in favor of the proposed constitution are denied "due process" and "equal protection of the laws" by dilution

- 6 -

of their vote by those not voting on that question in contravention of the Fourteenth Amendment to the United States Constitution.

At the outset we need not concern ourselves with any technical legal question concerning the parties, procedure, the acceptance of original jurisdiction by this Court, and related matters. This Court has previously accepted jurisdiction of this cause, no issues have been raised by the parties on these subjects, and such matters are irrelevant to our decision here. Instead, we direct our exclusive attention to determination of the substantive issue here involved.

Neither do we consider the pleading conflict raised by the Attorney General concerning the meaning and effect of the Secretary of State's certification of the "total number of electors voting" germane. The facts speak for themselves and only legal questions remain for our determination.

Directing our attention to the substantive issue, we observe that Article XIX, Section 8, of the present Montana Constitution provides for a separate election where a constitutional convention submits a proposed new constitution to the voters for their approval or rejection. We quote Article XIX, Section 8, in full, the underlined words being the portion thereof which we are called upon to construe:

> "The legislative assembly may at any time, by a vote of two-thirds of the members elected to each house, submit to the electors of the state the question whether there shall be a convention to revise, alter, or amend this constitution; and if a majority of those voting on the question shall declare in favor of such convention, the legislative assembly shall at its next session provide for the calling thereof. The number of members of the convention shall be the same as that of the house of representatives, and they shall be elected in the same manner, at the same places, and in the same districts. The legislative assembly shall in the act calling the convention designate the day, hour and place of its meeting, fix the pay of its members and officers, and provide for the payment of the same, together with the necessary expenses of the convention. Before proceeding,

the members shall take an oath to support the constitution of the United States and of the state of Montana, and to faithfully discharge their duties as members of the convention. The qualifications of members shall be the same as of the members of the senate, and vacancies occurring shall be filled in the manner provided for filling vacancies in the legislative assembly. Said convention shall meet within three months after such election and prepare such revisions, alterations or amendments to the constitution as may be deemed necessary, which shall be submitted to the electors for their ratification or rejection at an election appointed by the convention for that purpose, not less than two nor more than six months after the adjournment thereof; <u>and unless so submitted and approved by a majority of the electors voting at the election, no such revision, alteration or amendment shall take effect.</u>"(Emphasis added).

The crux of the issue is whether the underlined quoted language requires a majority of electors voting on approval or rejection of the proposed constitution or whether it requires some other majority.

Relators and others espousing their view contend that the quoted constitutional language is clear and we must declare what it plainly says. They argue that the use of different language in various election provisions of Sections 8 and 9 of Article XIX indicates an intent by the framers of the Montana Constitution to require something more than a simple majority to approve a proposed constitution submitted by a constitutional convention. They conclude that a majority of the total number of electors voting on any of the four questions on the ballot is required to approve the proposed 1972 Montana Constitution.

We note that all parties agree that the act of voting consists of marking a valid ballot that is deposited in the ballot box and counted in the election. Goodell v. Judith Basin County, 70 Mont. 222, 224 P. 1110; Maddox v. Board of State Canvassers, 116 Mont. 217, 149 P.2d 112, stand for the proposition that voting is the affirmative act of marking the ballot and depositing it in the ballot box in conformity with the election laws. Neither signing the registry of voters, nor being issued a ballot, nor having one's name appear on the poll book is enough, standing alone, to constitute the act of voting.

The issue before us is a narrow one but its solution is not simple. We recognize that there are two distinct and opposing lines of authority in other jurisdictions having the same or similar constitutional language. Earlier cases are collected in the Annotation appearing at 131 A.L.R. 1382. For examples of later cases see: State ex rel. Witt v. State Canvassing Board, 78 N.M. 682, 437 P.2d 143; In re Todd, 208 Ind. 168, 193 N.E. 865; Stoliker v. Waite, 359 Mich. 65, 101 N.W.2d 299. These cases are cited merely to indicate the two conflicting lines of authority but are not relied upon or determinative of our decision in the instant case. We prefer to look to Montana statutes and cases for guidance in interpreting the meaning of our own constitutional provisions.

The rules of statutory construction are equally applicable to interpretation of the meaning of provisions in the Montana Constitution. State ex rel. Gleason v. Stewart, 57 Mont. 397, 188 P. 904; Vaughn & Ragsdale Co.v. State Board, 109 Mont. 52, 96 P.2d 420. In construing the meaning of a statute, the intent of the framers, i.e., the legislature, is paramount. Section 93-401-16, R.C.M. 1947. In determining legislative intent, resort must first be made to the plain meaning of the words used. Dunphy v. Anaconda Co., 151 Mont.76, 438 P.2d 660, and Montana cases cited therein. In construing a statute, the function of the court is simply to ascertain and declare what is in terms or substance contained therein, not to insert what has been omitted nor to omit what has been inserted. Section 93-401-15, R.C.M. 1947. A statute must be read and considered in its entirety and the legislative intent may not be determined from the wording of any particular section or sentence, but only from a consideration of the whole. Home Bldg. & Loan v. Bd. of Equalization, 141 Mont. 113, 375 P.2d 312.

Applying these rules to the quoted constitutional language, a literal construction would seem to support relators. The quoted language speaks of approval "by a majority of electors voting at the election". But voting on what? The constitutional language does not expressly answer this. However, the substance of the language of the entire provision indicates that it refers to voting on approval or rejection of the proposed constitution, and it is to that question that the quoted language is directed. There is absolutely nothing to indicate that the framers had in mind a multiple issue ballot wherein contingent alternative issues would be submitted to the electors in addition to the primary question of approval or rejection of the proposed constitution itself. The best that can be said for relators is that the quoted language is ambiguous when read in connection with the entire constitutional provision relating to submission of the proposed constitution to the electors.

We are mindful of the principle that when a statute is equally susceptible of two interpretations, one in favor of natural right and the other against it, the former is to be adopted. Section 93-401-23, R.C.M. 1947. Majority rule is a natural right and fundamental tenet of government in a democracy, and only the strongest evidence that something more than a majority, i.e., an extraordinary majority, is required in a given situation will suffice. Here no such evidence exists.

Nor, in our view, is the difference in language employed in different election provisions of Article XIX controlling, or indicative of an intent by the framers of our Constitution to require approval of a proposed constitution by an extraordinary majority. The first part of Section 8 relating to calling a constitutional convention requires a referendum vote by "a majority of those voting on the question"; Section 9 dealing with submission of individual constitutional amendments by the legislature

requires referendum to the qualified electors and approval "by a majority of those voting thereon". That part of Section 8 we are called upon to construe requires submission of the proposed constitution to the electors "at an election appointed by the convention for that purpose, not less than two nor more than six months after the adjournment thereof" and approval by "a majority of the electors voting at the election".

The reason for the difference in language between these three provisions is readily apparent. The referendum to the voters on the calling of a constitutional convention is normally held at a general election as was done here; consequently, the phrase requiring "a majority of those voting on the question" was employed to distinguish the constitutional referendum question from other general election issues. The language of Section 9 relating to submission to the electors of individual constitutional amendments proposed by the legislature must be at a general election where up to three such amendments can be submitted at the same election, thus the language "approved by a majority of those voting thereon" is used. The language of Section 8, that we must construe --- "a majority of the electors voting at the election" was used because a separate election is required for approval or rejection of a constitution proposed by a constitutional convention and there is no need to differentiate between approval or rejection of a proposed constitution at such separate election and issues at some other election held at the same time. Accordingly, these differences in the language employed by the framers of our Constitution in the different election provisions of Sections 8 and 9 of Article XIX are no evidence of a differing intent on the part of the framers, but are the result of inherent constitutional differences in the elections themselves, which in turn requires different language.

Finally, if the framers of our Constitution had intended to require an extraordinary majority for approval of a proposed constitution submitted by an elected constitutional convention, they could easily have said so. Our Constitution contains several provisions requiring extraordinary majorities, but wherever such requirement is imposed the language is loud, clear and unambiguous. Examples of such provisions are: Changing the seat of government requiring "a vote of two-thirds of all the qualified electors of the state", (Article X, Section 3); overriding the governor's veto of a legislative act which requires that such act shall "be repassed by two-thirds of both houses" in order to become effective, (Article V, Section 40) and a specific detailed procedure therefor (Article VII, Section 12); submission by the legislature to the electors the question of calling a constitutional convention which requires "a vote of two-thirds of the members elected to each house", (Article XIX, Section 8); submission by the legislature to the electors of individual legislative proposed constitutional amendments which require a vote of "two-thirds of the members elected to each house", (Article XIX, Section 9).

We must also consider the effect of requiring an extraordinary majority in an election by counting the electors who vote on issues other than approval or rejection of the proposed constitution. In 18 counties of this state more electors voted on the gambling issue than voted on approval or rejection of the proposed constitution. If we interpret the constitutional provision in question as requiring the inclusion of these nonvoters on the proposed constitution in determining the required majority for its approval, we are in effect holding that the framers of our Constitution intended to give such abstainers the status of electors voting against the proposed constitution. This we refuse to do in the absence of a clear and unmistakable requirement of an extraordinary majority vote.

Additionally, we must consider the policy and philosophy of government contained in our Constitution as enunciated in numerous cases including Tinkel v. Griffin, 26 Mont. 426, 431, 68 P. 859. There the Court said:

> "The expression 'majority of the electors thereof voting at an election,' etc., clearly means a majority of those who vote, and not a majority of all of the electors of the county, or of those who vote upon any other issue, at the same or some other time." (Emphasis added).

The philosophy of our Constitution was further explained in this language from Tinkel:

> "It is the theory of our government that those electors control public affairs who take a sufficient interest therein to give expression to their views. Those who refrain from such expression are deemed to yield acquiescence.
>
> "In a recent case the court of appeals of Kentucky, having under consideration a similar constitutional provision, said: 'It is a fundamental principle in our system of government that its affairs are controlled by the consent of the governed, and, to that end, it is regarded as just and wise that a majority of those who are interested sufficiently to assemble at places provided by law for the purpose shall, by the expression of their opinion, direct the manner in which its affairs shall be conducted. When majorities are spoken of, it is meant a majority of those who feel an interest in the government, and who have opinions and wishes as to how it shall be conducted, and have the courage to express them. It has not been the policy of our government, in order to ascertain the wishes of the people, to count those who do not take sufficient interest in its affairs to vote upon questions submitted to them. It is a majority of those who are alive and active, and express their opinion, who direct the affairs of the government, not those who are silent and express no opinion in the manner provided by law, if they have any. Before reaching a conclusion that those who framed our fundamental law intended to change a well-settled policy by allowing the voter who is silent and expresses no opinion on a public question to be counted, the same as the one who takes an interest in and votes upon it, we should be satisfied that the language used clearly indicates such a purpose.' (Montgomery County Fiscal Court v. Trimble, 47 S.W. 773, 42 L.R.A. 738.)"

This Court reaffirmed the rule of Tinkel in Morse v. Granite County, 44 Mont. 78, 119 P. 286.

We consider the constitutional philosophy expressed therein concerning the Montana Constitution as valid today as it was when originally expressed three generations ago. We extend that constitutional philosophy to the instant case involving Article XIX, Section 8, and/multiple/election here involved. Here, we are simply not satisfied that the framers of our Constitution intended to require more than a simple majority vote on approval of the proposed constitution.

Accordingly, we hold that "approval by a majority of electors voting at the election" as used in Article XIX, Section 8, of the Montana Constitution means approval by a majority of the total number of electors casting valid ballots on the question of approval or rejection of the proposed 1972 Montana Constitution. We hold that it does not refer to or include those electors who failed to express an opinion by a vote on that issue. The Secretary of State's certificate shows 116,415 votes in favor of the proposed constitution and 113,883 votes against the proposed constitution and no one contends these figures are incorrect. As these figures carry a presumption of correctness by statute, section 93-1301-7(15), R.C.M. 1947, and as there is nothing to indicate otherwise, we hold that the proposed 1972 Montana Constitution was approved by the required majority and the Governor's proclamation thereof was correct.

Even under relators' interpretation of the constitutional requirement in question which we expressly reject, relators still cannot prevail. Relators would require an extraordinary majority to approve the proposed 1972 Montana Constitution, i.e., a majority of the total number of electors voting at the special constitutional election on any issue. The Secretary of State's certificate of the abstract of votes as determined by the state canvassing board shows "Total number of electors voting. 237,600" which relators contend must be accepted as correct by statute.

This figure is clearly incorrect even under relators' interpretation of Article XIX, Section 8.

The Secretary of State by letter dated June 2, 1972, instructed the county clerks and recorders of each county to "enter the total number of electors who are listed on the poll books for the separate election on the proposed constitution on the front of the abstract book for that election". The affidavit of the members of the state canvassing board indicates that the phrase "'Total number of electors voting', as used in said canvass and certificate, refers to the total number of electors appearing at the polls and receiving ballots, plus the number of electors receiving and returning absentee ballots." The affidavit of the Secretary of State is to the same effect.

An "elector" is a person possessing the legal qualifications that entitle him to vote. State ex rel. Lang v. Furnish, 48 Mont. 28, 134 P. 297. The word "voting" means the affirmative act of marking one's ballot properly and depositing it in the ballot box in conformity with the election laws. Goodell v. Judith Basin County, 70 Mont. 222, 224 P. 1110; Maddox v. Board of State Canvassers, 116 Mont. 217, 149 P.2d 112. Thus "electors voting in the election" within the meaning of Article XIX, Section 8, of the Montana Constitution means those persons entitled to vote who cast a properly marked ballot which is counted in the election. Electors casting blank ballots, unintelligible ballots, fouled, void, or illegal ballots are not included as "electors voting in the election" because their ballots are not entitled to be counted in the election. See section 23-4002(4) and section 23-4003(5), R.C.M. 1947; Peterson v. Billings, 109 Mont. 390, 96 P.2d 922; Heyfron v. Mahoney, 9 Mont. 497, 24 P. 93. Thus, it is not the total number of electors appearing at the polls and receiving ballots as listed in the poll books that constitutes the total number of "electors voting in the election", but the

total number of electors casting properly marked ballots that are counted in the election. Accordingly, the figure of 237,600 labeled "total number of electors voting at the election" on the Secretary of State's certificate is demonstrably incorrect, and the disputable statutory presumption of correctness of such figure (Section 93-1301-7(15)) must yield to the facts.

What then, under relators' interpretation of Article XIX, Section 8, is the correct figure on the total number of electors voting at the election? We can make that determination on the materials before us. If we take the total number of electors who cast ballots that were counted on the issue receiving the largest total vote, this should approximate the total number of electors voting in the election. On a statewide basis, the issue of approval or rejection of the proposed constitution received the highest total vote, 116,415 "for" and 113,883 "against", or a total vote of 230,298.

However, the Secretary of State's printed report of the official canvass, county by county, discloses that the electors in 18 of Montana's 56 counties cast a higher total vote on the gambling issue than on the issue of approval or rejection of the proposed constitution. In those 18 counties 290 more electors cast valid votes that were counted on the gambling issue than upon the issue of the proposed constitution; no other issue on the ballot in the special constitutional election received more total votes cast and counted in any county, with this exception. These 290 electors must be added to the statewide total of electors voting on approval or rejection of the proposed constitution (230,298) in order to get the total number of electors voting in the election, 230,588. As more than one-half of this 230,588 figure voted "for" the proposed constitution (116,415),

"a majority of the electors voting at the election" voted for the proposed 1972 Montana Constitution, even under relators' interpretation of Article XIX, Section 8, of Montana's present Constitution.

The other issues raised not being germane to our decision herein they need not be discussed nor determined in this opinion.

_____
Associate Justice

We Concur:

_____
Chief Justice

_____

_____
Associate Justices.

Mr. Chief Justice James T. Harrison and Mr. Justice Wesley Castles dissenting:

We dissent.

The majority opinion states "The crux of the issue is whether the underlined quoted language requires a majority of electors voting on approval or rejection of the proposed constitution or whether it requires some other majority." We would hold that the quoted language "a majority of the electors voting at the election", means just what it says. The majority opinion goes on to say "There is absolutely nothing to indicate that the framers had in mind a multiple issue ballot wherein contingent alternative issues would be submitted to the electors in addition to the primary question of approval or rejection of the proposed constitution itself. The best that can be said for relators is that the quoted language is ambiguous when read in connection with the entire constitutional provision relating to submission of the proposed constitution to the electors."

The majority opinion then goes on to say the language is not ambiguous but is clear, and that the reason for the difference in language between the three provisions in Article XIX, Sections 8 and 9 of the Montana Constitution is "readily apparent".

This is the fourth case to be before this Court involving the effort to amend, revise, or alter the Constitution of this state. The interpretation and language of each of the previous three cases was consistent. But now, we depart from that consistency. The three previous are: 42nd Leg. Assembly v. Lennon, 156 Mont. 416, 427, 431, 481 P.2d 330; Mahoney v. Murray, _____Mont._____, 496 P.2d 1120, 29 St.Rep. 289; State ex rel. Kvaalen v. Graybill, _____Mont._____, 496 P.2d 1127, 29 St. Rep. 313.

In Lennon, Mr. Justice Haswell had this to say:

"At issue is whether the phrase requiring that constitutional delegates be 'elected in the same manner' as members of the house of representatives appearing in/Article XIX, section 8 of the Constitution refers only to constitutional requirements for the election of state representatives, or whether it encompasses both constitutional and statutory requirements for election of state representatives. We hold that the phrase 'elected in the same manner' means exactly what it plainly says----that constitutional delegates are required to be elected by the same election procedures applicable to election of members of the house of representatives without limitation as to the source of such election procedures be they constitutional or statutory. Had the framers of the Constitution intended to limit this phrase to constitutional requirements only, they would hardly have used this particular language knowing that the Constitution contained only broad requirements for elections in general without specific constitutional procedures applicable to election of representatives. By their language coupled with the absence of specific constitutional procedures applicable to the election of representatives, the framers of our Constitution must have intended the requirement to apply to statutory election procedures for representatives to be subsequently enacted by the legislature and amended from time to time. We remain unimpressed with the applicability to Montana of three cited cases from other states to the contrary: Livingston v. Ogilvie, 43 Ill.2d 9, 250 N.E.2d 138; Baker v. Moorhead, 103 Neb. 811, 174 N.W. 430; and In re Opinion of the Justices, 76 N.H. 586, 79 A. 29. These holdings are understandable under their particular state history and their particular constitutional provisions, but their application to Montana in the light of its history and constitutional provisions is entirely unwarranted."

And further:

"A further observation, albeit unsolicited, is that since the referendum uses the language 'revise, alter, or amend the constitution' it must have been contemplated that the work of the convention might be partial or total and that the individual parts might be submitted to the people. Therefore each Article might be separately submitted."

Yet here, in the majority opinion, Mr. Justice Haswell states that there is nothing to indicate the framers had in mind a multiple issue ballot. He must have forgotten what he wrote in Lennon. Also, he must have ignored the plain meaning of the language in Sections 8 and 9, Article XIX.

Following is our view of the law and our resolution of the problem at issue. The issue is a narrow one but the solution is difficult.

Article XIX, Section 8, states:

"The legislative assembly may at any time, by a
vote of two-thirds of the members elected to each
house, submit to the electors of the state the
question whether there shall be a convention to
revise, alter, or amend this constitution; and
if a majority of those voting on the question shall
declare in favor of such convention, the legislative
assembly shall at its next session provide for the
calling thereof.  The number of members of the con-
vention shall be the same as that of the house of
representatives, and they shall be elected in the
same manner, at the same places, and in the same
districts.  The legislative assembly shall in the
act calling the convention designate the day, hour
and place of its meeting, fix the pay of its members
and officers, and provide for the payment of the
same, together with the necessary expenses of the
convention.  Before proceeding, the members shall
take an oath to support the constitution of the
United States and of the state of Montana, and to
faithfully discharge their duties as members of the
convention.  The qualifications of members shall be
the same as of the members of the senate, and vacan-
cies occurring shall be filled in the manner provided
for filling vacancies in the legislative assembly.
Said convention shall meet within three months after
such election and prepare such revisions, alterations
or amendments to the constitution as may be deemed
necessary, which shall be submitted to the electors
for their ratification or rejection at an election
appointed by the convention for that purpose, not
less than two nor more than six months after the
adjournment thereof; and unless so submitted and
approved by a majority of the electors voting at the
election, no such revision, alteration or amendment
shall take effect."  (Emphasis supplied)

Article XIX, Section 9, states:

"Amendments to this constitution may be proposed
in either house of the legislative assembly, and
if the same shall be voted for by two-thirds of
the members elected to each house, such proposed
amendments, together with the ayes and nays of each
house thereon, shall be entered in full on their
respective journals; and the secretary of state shall
cause the said amendment or amendments to be pub-
lished in full in at least one newspaper in each
county (if such there be) for three months previous
to the next general election for members to the
legislative assembly; and at said election the said
amendment or amendments shall be submitted to the
qualified electors of the state for their approval
or rejection and such as are approved by a majority
of those voting thereon shall become part of the
constitution.  Should more amendments than one be
submitted at the same election, they shall be so
prepared and distinguished by numbers or otherwise that
each can be voted upon separately; provided, however,
that not more than three amendments to this constitu-
tion shall be submitted at the same election." (Emphasis
supplied)

In the foregoing quoted Sections 8 and 9 of Article XIX, the underlined portions show these distinct language differences:

Section 8. In a call for a convention----those voting on the question.

Section 8. In approval of a revision----the electors voting at the election.

Section 9. In approval of amendments ----Those voting thereon.

Our constitutional provisions on voting in different types of elections have other examples of varying language used, e.g.:

Article X, Section 2, concerning the permanent seat of government----"the majority of all the votes upon said question";

Article X, Section 3, concerning a change of the seat of government ----"a vote of two-thirds of all the qualified electors of the state voting on that question";

Article XII, Section 9, concerning a statewide tax rate of 2 mills----"a majority of all votes cast for and against it";

Article XIII, Section 2, concerning debt limit ----"a majority of the votes case for and against it";

Article XIII, Section 5, concerning county debt limit ---- "a majority of the electors thereof, voting at an election to be provided by law";

Article XVI, Section 2, concerning removal of a county seat ----- "a majority of the qualified electors of the county at a general election on a proposition to remove the county seat, shall vote therefor";

Article XVI, Section 8, concerning consolidation of counties ---- "a majority vote of * * * electors in each county * * * expressed at a general or special election held * * *".

The basic issue before this Court should require us to determine the intent of the framers of the Montana Constitution when they adopted Section 8 of Article XIX at the constitutional

convention, August 17, 1889. That section reads in part:

"* * * and unless so submitted and approved by
a majority of the electors voting at the election,
no such revision, alteration or amendment shall
take effect."

The traditional rules of construction in cases of this
kind have been succinctly set forth in the classic decision Knight
v. Shelton, (E.D.Ark.1905), 134 Fed. 423, 426, wherein the court
was confronted with the construction of the constitutional provi-
sion of the Arkansas Constitution concerning amendment to its
constitution. There the court summarized:

"1. There are certain rules of law which are so
well settled that it is unnecessary to refer to
authorities to sustain them. Among these are the
following: A Constitution can be amended only in
the mode therein prescribed. The construction of
constitutional provisions is governed by the same
rules which apply to the construction of statutes.
The language used is to be given the natural
signification that the words imply, in the order
and grammatical arrangement in which the framers
used them, and if, thus regarded, the words convey
a definite meaning which involves no absurdity, and
no contradiction between parts of the same writing,
then the meaning apparent upon the face of the in-
strument is the one which alone courts are at liberty
to say was intended to be conveyed. If there is no
ambiguity in the language used, there is nothing to
construe, and courts must follow the letter of the
Constitution. It is only when the language used is
not clear or unambiguous that courts are permitted to
resort to the rules of construction which govern
courts in ascertaining the intent of the framers.
If any of the provisions are unjust, so that their
enforcement will work a hardship to any class of
persons, the remedy must come from the people who
have adopted them. Construction can furnish no
remedy under our system of government."

Under Section 8, the natural significance of the phrase
"majority of the electors voting at the election" is that to deter-
mine whether the proposed constitution was adopted, you count the
total number of electors voting at the election, and one-half plus
one must have voted for the measure or it fails.

We shall analyze this interpretation on which, at first blush,
the authorities may seem to be split, but there is something we
feel reconciles any apparent variance in the cases. That point is

that Montana in the recent election of June 6, 1972, treated the vote on the proposed constitution and the three matters submitted with it as a separate election from the regular primary. The fact that the constitutional election was a separate one is conclusively established by the mandatory requirement of Article XIX, Section 8, which states the ratification or rejection by the people must be by an election "for that purpose." This is more clearly pointed out when it is found that the poll books disclose more people voted in the regular primary than voted on the constitutional issue. Also, the facts are that there was a great variance in the number of people who voted on the other three matters referred and on the proposed constitution itself, so it would be pure conjecture to determine who voted on the constitution and who did not.

All briefs touching the point at issue here discuss two Montana cases, Tinkel v. Griffin, 26 Mont. 426, 68 P. 859 and Morse v. Granite County, 44 Mont. 78, 119 P. 286. We shall discuss these cases later after first turning our attention to other authorities.

State ex rel. Hayman v. State Election Board, (1938), 181 Okla. 622, 75 P.2d 861,862,864, is a case in which a constitutional amendment was submitted to the voters, and the constitution of Oklahoma provided, in part:

> "If a majority of all the electors voting at such election shall vote in favor of any amendment thereto, it shall thereby become a part of the Constitution."

Oklahoma also has a statute which makes every precinct election board return to the county election board the total number of electors voting at the election so the state election board could certify the total number of ballots cast at the particular election. The same statute requires the county election boards to record the number of ballots spoiled or not voted, all of which is reported to the state election board. The proposed amendment received a affirmative vote of 379,405, and a negative vote of 219,996. The

total votes cast as shown by the certificate was 767,745 votes, and the election board determined that the amendment did not pass. An action was brought, and the Oklahoma Supreme Court held that the election board was correct. The Supreme Court refused to issue the writ to change what the election board had reported, and among other things made the following observation:

> "Under this suggested method, no elector would be considered who did not vote on the office or measure receiving the highest vote, thereby eliminating many voters who, in the instant case, voted only State, county, or precinct ballots. The inaccuracy and fallibility of this method are conspicuously apparent. They assert that this number should arbitrarily be considered as representing the number of 'electors voting at such election.' This is predicated upon a presumption which is significantly contrary to the actual and admitted facts as presented in this case. By this method every voter appearing at the polls who did not see fit to cast a vote for presidential electors, but who may have voted for every other State officer, or county or precinct officer, or on the submitted amendment itself, is eliminated from consideration as an 'elector voting at such election.' This is in direct discord with the theory conceded by all parties to this proceeding that every voter appearing at the polls and casting a vote for or against any candidate or measure submitted is to be considered in determining the total number of 'electors voting at such election.'" (Emphasis supplied).

In People v. Stevenson, (1917), 281 Ill. 17, 117 N.E. 747, 749, a constitutional amendment had been submitted to the voters by the legislature. The canvassing board returned that 1,343,381 male electors voted at the election; 656,782 voted for the proposed amendment, and 295,782 voted against it. The canvassing board then determined the highest number of votes cast for the members of the legislative assembly, and since the vote on the constitutional amendment was more than half of the vote for the members of the assembly, as figured by their formula, the canvassing board determined that the amendment had been adopted. The trial court reviewed the decision of the canvassing board and determined that the amendment had not been adopted. In affirming this decision, the appellate court discussed the 1818 Constitution of Illinois and the 1848 Constitution of Illinois. The decision was given under Section

1, Article 14, of the Constitution of 1870, which provided that "if a majority voting at the election" voted for the amendment, it was carried. The Court made the following observations:

> "It seems to us that the people who read and voted on the adoption of the Constitution would not have understood it to mean that an election at which a constitutional amendment was voted on, whether it was adopted or rejected, was to be determined by the vote of those, only, who voted for members of the General Assembly. A more reasonable understanding, requiring no construction or conjecture, would seem to be that the amendment must receive a majority of the votes cast at the election.

> "* * *

> "The intention to which force is given in construing constitutional provisions is that which is embodied and expressed in the language of the provisions.

> "As a Constitution is dependent upon adoption by the people, the language used will be understood in the sense most obvious to the common understanding.

> "The language and words of a Constitution, unless they be technical words and phrases, will be given effect according to their usual and ordinary signification, and courts will not disregard the plain and ordinary meaning of the words used, to search for some other conjectural intention. 6 R.C.L. 52; Law v. People, 87 Ill. 385; Hills v. City of Chicago, 60 Ill.86."

The Wyoming Supreme Court in State ex rel. Blair v. Brooks, (1909), 17 Wyo. 344, 99 P. 874, considered a vote on a constitutional amendment. The Wyoming Constitution, in Article 20, Section 1, requires that an amendment receive a majority of the electors. It appeared that 37,561 votes were cast at an election on a constitutional amendment and 12,160 voted in favor of the amendment, and 1,363 voted against the amendment. The Court observed that the cases are in conflict, but that the language used in the Wyoming Constitution referred to the electors of the state so that the matter must carry by more than a majority of those voting on the proposition, and it must be a majority of those who showed themselves to be electors.

In Green v. State Board of Canvassers, (1896), 5 Ida. 130, 47 P. 259,260, the Supreme Court of Idaho had before it a constitutional amendment which was voted upon by the electorate of Idaho

to give women suffrage;   12,126 voted for and 6,282 voted against. The board of canvassers reported the amendment as not being adopted and an action ensued.   The Idaho State Constitution contains a provision that amendments are approved "if a majority of the electors shall ratify the same".   Idaho also has in Article 20, Section 3, a provision similar to ours, "if a majority of all the electors voting at said election shall have voted for a convention * * *."   The Idaho Court made a great distinction between the meaning of the two provisions and made the following observation which is important here because of the similarity of the language construed to that to be construed in the instant case:

> "If they were, as counsel for defendants contend, intended to mean the same thing, why was not the same language used?  We know of no rule of construction, nor has our attention been called to any, that would warrant us in arbitrarily saying that the language used in the two sections was intended to mean the same thing.  On the contrary, the reason seems to us to be the other way.  We can understand why the makers of the constitution should apply a different and more stringent rule in the adoption of a call for a constitutional convention from what they would in the matter of a mere amendment.  It is true, the amendment under consideration is one of vast importance, but so, likewise are the other amendments submitted at the same time.  With the character or importance of the amendment we have nothing to do in this consideration.  Was the amendment adopted as required by the terms and provisions of the constitution?  To hold that it was not is virtually to say that no amendment of the constitution is practicable. In fact, counsel do not strenuously contend for a construction involving such a conclusion, but rather insist that the words 'majority of the electors,' in section 1, should be construed to mean the same as the words 'majority of all the electors voting at such election,' in section 3.  Even the authorities cited by counsel do not go to such an extent to sustain such a conclusion."

The reasoning and construction of the Idaho Court is proper and logical.   It is a maxim of statutory construction, no less applicable to constitutional law, that "where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."   Section 93-401-15, R.C.M. 1947.   Moreover, the intent of the framers must be determined from the language used in the document.   The reasoning of the Idaho Court is consistent with these principles for it gives

- 26 -

effect to two differently worded sections "majority of the electors" and "majority of all electors voting at said election." The apparent intent of the framers to impose a stricter requirement in convening a convention than in ratifying an amendment is also considered.

In Lee v. State of Utah, (1962), 13 Utah 2d. 15, 367 P.2d 861, a constitutional amendment relating to wartime and emergency powers of the legislature was submitted to the voters and thereafter was attacked on the grounds that a majority of the electors registered had not voted. The Supreme Court of Utah held that as the majority of electors voting thereon, as provided by their constitution, had voted in favor, the amendment had been ratified.

In Town of Pine Bluffs v. State Board of Equalization, (1958), 79 Wyo. 262, 333 P.2d 700, it was contended that a constitutional amendment was not properly adopted because it was not supported by a majority of the electors of the state although it got a majority of those voting on the proposition. However, it did have a majority also of those voting at that particular election. The argument was that there were more franchised voters in the state taking into consideration all the people who were registered, and as a consequence, it did not receive the support of a majority of the electors. The Court there held, citing Indiana, that a sensible construction had to be applied, and the wording "all electors of the state" are the electors voting at the particular election.

Article XIX, Section 8, of the Montana Constitution relating to the ratification of constitutional revisions after a convention, provides in part that such ratification must be "by a majority of the electors voting at the election." Section 9, relating to the ratification of amendments proposed by the legislature, provides in part that such amendments must be "approved by a majority of those voting thereon." It is this difference in language which dictates that the proposed constitution may have failed. "[Voting

thereon" as interpreted by the Idaho Court in <u>Green</u>, may be taken to mean a count of ayes and nays. "[V]oting at the election" must mean something different and more; that is, all those who cast ballots whether ayes, or nays, on any one of the four issues submitted.

In fact, in Stoliker v. White (1960), 359 Mich. 65, 101 N.W.2d 299, 300,304, the Court based its decision on such a distinction:

> "The question before us is this: Does the Constitution require a different vote for the call of a constitutional convention than it requires for the adoption of an amendment to the Constitution?
>
> "* * *
>
> "What the Constitution actually says is that the adoption of a constitutional amendment requires <u>a majority of the electors 'voting thereon,'</u> whereas a call for a constitutional convention requires a 'a <u>majority of such electors voting</u> <u>at such election.'</u>
>
> "* * *
>
> "In short, we are now asked to hold that the people did not clearly understand what they were thus doing. We are asked to hold that, despite the 1899 opinion of the Attorney General upon the very issue here presented, despite the unsuccessful legislative attempt to overcome it immediately thereafter, despite the ruling of the Board of State Canvassers that the 1904 proposition had failed to carry for lack of the necessary majority, and despite the re-enactment in the new Constitution of the very language over which all of this turmoil had raged, the people did not really understand the clear meaning of the words they were using, once again, in their new Constitution. (Constitution of 1850, article 20,§2: '* * * in case a majority of the electors so qualified, voting at such election, shall decide in favor of a convention * * *.' Constitution of 1908, article 17, §4: ' * * * In case a majority of such electors voting at such election shall decide in favor of a convention * * *.') We are to hold that when they required to pass a constitutional amendment a majority of the votes cast thereon, and when they required to call a constitutional convention a majority of the votes cast at such election, they were actually prescribing no difference between the two votes but were in fact merely calling for the same vote on each. All of this we decline to do. The understanding of our people is not so meager. Their distinguished leaders who framed the Constitution were not so inept, so thoughtless, so blind to the issues of the day. From the language used it is clear that

they meant to distinguish between the votes
required for a simple amendment and those re-
quired to call a constitutional convention,
and our holding is that they did so distinguish.

"We have thus relied upon the contemporaneous
understanding of the people. Their understanding
is as relevant today as it was a half-century ago
and it has a direct applicability to the situation
before us. When the people went to the polls in
1958 to vote upon the question of a constitutional
convention, they went with the contemporaneous
understanding that a failure to vote upon the con-
stitutional question would have the practical effect
of a vote in the negative thereon. Such is not only
the clear phrasing of the Constitution but the highest
court in the State had unanimously so ruled with
respect thereto. We have no way of knowing how many
of the 900,000 electors who failed to vote on the
issue would have voted in the affirmative thereon,
had they voted, or how many who failed to vote did so
because of reliance upon the practical effect of their
failure to vote. Obviously we cannot say that the
proposition carried nor can we command the Board of
State Canvassers, as plaintiff wishes, 'to certify
that the revision question carried.'"

There are two Montana cases construing the election pro-

visions of the current Constitution concerning voting on bond

elections. In Tinkel v. Griffin, (1902), 26 Mont. 426,431, 68 P.

859, the Supreme Court had before it a vote in Flathead County

for the building of a new county courthouse and jail. The county

commissioners had regularly submitted to the voters the matter

of the loan. That election was held under Article XIII, Section

5, of the Constitution which contains the following language:

"* * * No county shall incur any indebtedness
or liability for any single purpose to an
amount exceeding ten thousand dollars ($10,000)
without the approval of a majority of the
electors thereof, voting at an election to be
provided by law."

This language is somewhat different than the language in Sections

8 and 9, Article XIX, of the Constitution. The question arose as

to what constituted a majority of the electors of the county voting.

The Court pointed out that the election could have been held by

itself or at any time. As a consequence, the majority of the electors

voting at the election to be provided by law would be only those

who voted on the bonds themselves.

The Supreme Court treated the election on bonding the county as a special election, although it was held at the same time as the general election. Thus there were two elections the same day. The Court in <u>Tinkel</u> said this:

"It appears that the highest number of votes cast for any office voted upon at the election was 2,400, that 1,000 were cast in favor of the issuance of the bonds, and that 462 were cast against it. It thus clearly appears, counsel say, that the proposition did not receive a majority of the electors voting, within the meaning of Section 5, Article XIII, of the Constitution.

"It will be observed that the requirement is that the approval must be by a majority of the electors of the county voting, not at a general election, but at <u>an election to be provided by law.</u>

"As we have seen, such an election has been provided by law to be held at any time it may be deemed necessary by the board of commissioners. It happens, also, that the manner of holding it is the same as that prescribed for general elections. Thus it may, with perfect propriety, be held at the same time at which a general election is held; but the fact that this is the case does not require a different standard of estimating the majority necessary from that which would govern if the election is held on a different day. The evident meaning of the constitution is that the approval must be the result of an expression of a majority of those voting. The expression 'majority of the electors thereof voting at an election,' etc., clearly means a majority of those who vote, and not a majority of all the electors of the county, or of those who vote upon any other issue at the same or some other time. If the election on the issue of a loan had been upon another day, there would have been no question but that it would have had a majority of the electors of the county who voted. It was none the less a special election, within the meaning of the law, though in this particular instance it was held, for convenience, on the day fixed for a general election."

The Court felt that only those who voted on the bond issue should have been counted in determining whether a majority voted for or against the bonds. We have no argument with that philosophy. <u>The same argument is applicable to the case at bar because the total number of votes for the proposed constitution may have been less than a majority of those who voted on that separate issue.</u>

<u>Tinkel</u> was followed by Morse v. Granite County, (1911), 44 Mont. 78, 95, 119 P. 286. There, the county commissioners called

an election to submit to the voters the matter of borrowing $50,000 to build a courthouse. The district court of Granite County ruled inter alia that not sufficient voters had voted in favor of the bond and held the bond issue void and ordered an injunction to issue. The Court cited Tinkel with approval:

> "'The evident meaning of the Constitution is that the approval must be the result of an expression of a majority of those voting. The expression "majority of the electors thereof voting at an election," etc., clearly means a majority of those who vote, and not a majority of all the electors of the county, or of those who vote upon any other issue at the same or some other time.'"

The Court then went on to say that the laws and the Constitution should be so interpreted as to become useful. A majority of the electors who voted at the election on June 6, 1972, may not have voted for the proposed constitution, the same as the Court held in the two Montana cases just cited.

We would find then that "positive assent" is the same as "a majority of the electors voting at the election". This positive assent is referred to by many writers and courts as an extraordinary majority.

The question in the instant case is a majority of what group? Clearly, that of "electors voting at the election" is required. What that means under the facts here is the problem.

As related heretofore, the relators' position is simply that the Secretary of State's certified number voting is 237,600 and that answers the question.

But does it?

The respondent says simply that the group "voting at the election" is confined to those voting on issue # 1, or as he puts it the "main issue" and that answers the question.

But does it?

We should then attempt to analyze the figure certified by the Secretary of State. The Secretary of State recited that he had

Proposed Constitution

Number of Electors Voting ....................

# ELECTION RETURNS

### ELECTION FOR THE RATIFICATION OR REJECTION OF THE
### PROPOSALS OF THE CONSTITUTIONAL CONVENTION, JUNE 6, 1972

## For the County of *Cascade*

STATE OF MONTANA    } ss.

County of ................................

The undersigned hereby certify that the within constitutes a full, true and complete Abstract of Votes cast in

.......................................... County, at an election

held June 6, 1972, for:

Ratification or rejection of the proposals of the Constitutional Convention.

Attest our hands this.................................................day of June, 1972.

..................................................

..................................................

..................................................

} County Canvassing Board

Note: County Canvassing Board must individually sign this certificate.

FILED Office Secretary of State on the.................day

of........................ 1972, at the hour of ..........M.

....................................................
Secretary of State.

By: ........................................
.................................. Deputy

I, .................................................., County Clerk and Ex-Officio Clerk of the Board of County Canvassers of said County, do hereby certify that the within constitutes a true, full and complete abstract of the number of votes cast in each precinct of said County, for the proposals enumerated herein.

Attest my hand and the seal of said County, hereto affixed

this.................................................day of June, 1972.

(OFFICIAL SEAL COUNTY CLERK)

.................................................
County Clerk and Clerk of said Board of

County Canvassers of.....................
County, State of Montana.

- 33 -

| Ratification or Rejection of the Proposed Constitution | Precinct 1 | Precinct 2 | Precinct 3 | Precinct 4 | Precinct 5 | Precinct 6 | Precinct 7 | Precinct 8 | Precinct 9 | Precinct 10 | Precinct 11 | Precinct 12 | Precinct 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1.** | | | | | | | | | | | | | |
| FOR THE PROPOSED CONSTITUTION. | | | | | | | | | | | | | |
| AGAINST THE PROPOSED CONSTITUTION. | | | | | | | | | | | | | |
| **2.** | | | | | | | | | | | | | |
| 2A. FOR A UNICAMERAL (1 HOUSE) LEGISLATURE. | | | | | | | | | | | | | |
| 2B. FOR A BICAMERAL (2 HOUSES) LEGISLATURE. | | | | | | | | | | | | | |
| **3.** | | | | | | | | | | | | | |
| 3A. FOR ALLOWING THE PEOPLE OR THE LEGISLATURE TO AUTHORIZE GAMBLING. | | | | | | | | | | | | | |
| 3B. AGAINST ALLOWING THE PEOPLE OR THE LEGISLATURE TO AUTHORIZE GAMBLING. | | | | | | | | | | | | | |
| **4.** | | | | | | | | | | | | | |
| 4A. FOR THE DEATH PENALTY. | | | | | | | | | | | | | |
| 4B. AGAINST THE DEATH PENALTY. | | | | | | | | | | | | | |

- 34 -

From the Secretary of State's certificate of canvass it is obvious that some electors did not vote for or against all of the issues on the ballot. A total of 230,298 electors voted on the first issue, 217,684 electors voted on the second issue, 228,125 electors voted on the third issue, and 224,756 electors voted on the fourth issue. The total number of electors voting was certified as 237,600. In a compilation of votes by counties prepared by the Secretary of State from the abstracts, on issue #3 there were 18 counties which had more votes than on issue #1, by a total of 290 votes. This fact, standing alone, demonstrates conclusively that electors voted on the ballot (thus at the election) but did not all vote on issue #1. But of the 7,302 votes difference between the number voting on issue #1 and the total number certified as voting at the election, it is impossible on the record before us to determine how many of that number are actual votes cast or just ballots issued. In other words, does 237,600 represent a net voting figure or a gross figure of those receiving ballots?

Section 23-4002(4), R.C.M. 1947, provides:

"A ballot which is not endorsed by the official stamp is void and shall not be counted. A ballot or part of a ballot is void and shall not be counted if the elector's choice cannot be determined. If a part of a ballot is sufficiently plain to determine the elector's intention, the election judges shall count that part."

It is clear that the "number voting" should be the net figure. Further proof of this statement can be found by examining the voting process under our statutes. Since the general election laws are to be followed, sections 23-3601 through 23-3618, R.C.M. 1947, set the procedure for voting. The voting on the proposed constitution was treated as a special election and special poll books were kept on the voting. Section 23-3610 provides that the person's name must be recorded in the poll book as he voted; provides for the keeping of records for the list of all voters who voted, and a certification by each precinct as to who voted;

and provides that the clerk of elections shall keep a list of persons voting. The name of each person who votes must be entered thereon and numbered in the order voting. Such list is known as the poll book. From these poll books each county clerk/should know exactly how many persons voted on the constitution. If the officials followed the law, section 23-3605 provides that unmarked ballots should be returned to the election judges. Section 23-3606 provides that a voter shall receive a new ballot for a spoiled one.

As to the counting and canvassing of the count, sections 23-4001 through 23-4019, R.C.M. 1947, make the provisions. Section 23-4002 provides for a method of handling spoiled or voided ballots and for an actual tally of the number of voters who cast ballots. If the provisions of the law were followed meticulously, the number of votes counted would be all good ballots and result in a net figure.

On the other hand, we have previously set forth in full the Secretary of State's directive or instructions dated June 2, 1972. There he states: "In preparing * * * the abstracts * * * (1) Check all totals against precinct entries. * * *(4) It is very important that you enter the total number of electors who are listed on the poll books for the separate election on the proposed constitution on the front of the abstract book for that election. Please check this figure carefully for accuracy. * * *"

Note the underlined instructions----electors listed. Is that consistent with the figure required by the statutes, electors who voted a valid ballot after the tally of the poll books was adjusted?

We were assured when we assumed jurisdiction of this matter that no factual dispute existed. Yet, the Governor's answer admits the allegation of the petition that 237,600 electors voted

at the special election and then files with his brief, through the Attorney General, an affidavit of himself, the Secretary of State, and the State Treasurer, constituting the state canvassing board, which asserts that the figure 237,600 was the total number receiving ballots plus absentees, thus a gross figure rather than a net figure as is seemingly admitted in the answer. This presents a fact issue as discussed before---in fact the critical, controlling fact figure.

Examining the tabulation by counties of the two separate elections held on the same day and judged, counted, and canvassed by the same election officials, it appears that in the primary election a total of 238,215 votes were cast, while in the special constitutional election 237,600 votes were cast. Out of those total votes cast, 24 counties show differences between the primary and special election totals, while, significantly, 32 counties show identical totals! Using one example, in Lewis and Clark County, the seat of the State Capitol, 13,867 votes were cast in the primary and 13,867 votes were cast in the special. Can these be possible net figures? Was not a single ballot mutilated or voided for some reason in one or the other election?

Or taking another example from Beaverhead County, the first county listed alphabetically, the total votes cast in the two separate elections is recorded as 2,832, identical in each. Yet in the partisan races for nominations to the United States Senate where two men, including incumbent Senator Metcalf, vied for the Democratic nomination and four men vied for the Republican nomination, a total of 2,391 votes was tallied. 441 voters either did not vote at all on that important race or their ballots were not properly accounted for. In that same county with nine candidates running for the nomination for governor, a total of 2,686 votes cast was tallied. 146 votes reported as voting on that important office were not accounted for but significantly 295 more voters expressed

a preference here than in the senatorial race. This example demonstrates that voters do not vote on all offices or all issues, but nevertheless do vote, and the total number of electors voting at an election cannot be measured by a single issue or office in that particular election.

These questions pose other questions. Did the precinct and county election officials follow the election laws by adjusting or balancing their poll books with the valid ballots? Or, did they follow the Secretary of State's instructions by inserting the number of electors listed in their poll books? It appears beyond a doubt that some precincts and some counties did it each way! Thus the figure of 237,600 certified by the Secretary of State likely reflects a combination among counties of net and gross figures. It is a critical fact question that no analysis short of a recanvass by precinct can answer.

It is noted here that no suggestion of fraud, bad faith, irregularity or anything of that nature has been reported or urged in any of the 981 precincts in the entire state. That the election result on the proposed constitution was close is self-apparent----a difference of only 2,532 votes. The proposed constitution was approved in 12 counties and defeated in 44 counties. Would a recanvass affect the result? Who knows, without the correct figure in the formula?

The foregoing should pose a dilemma for this Court. We are aware that the briefs argue on burden of proof and presumptions of law. Each side applies these legal arguments to prove its position. But from our previous discussion it is clear that to change such a basic document as our Constitution, a clear cut will of the people expressed within the rules laid out in Article XIX, Section 8, is mandatory and should not rest on the niceties and subtleties of the rules on burden of proof and presumptions of law. We are here concerned with hard, cold, mathematical facts which can be determined. This Court has the responsibility to see that the facts are determined.

We would find that the only solution to this problem is to grant a writ of mandamus to compel a recanvass by precinct of the votes cast in the June 2, 1972 election. A canvassing board cannot evade its duties by adjourning without taking the action required by law, and mandamus lies to compel its members to reassemble and perform their duty. A partial or incomplete canvass is viewed in the same manner as a total failure to make a canvass in the first instance, and a writ may issue to compel the board to reassemble and make a complete and accurate canvass of all the returns. This is supported by ample statutory and case law.

In this analysis the first point that must be considered is the statutory law. Sections 23-4007 and 23-4008, R.C.M. 1947, state:

"23-4007. Disposition of items by registrar. (1) When the registrar receives the packages or envelopes, he shall file those containing the ballots voted and detached stubs and the unused ballots and keep them unopened for twelve (12) months. After twelve (12) months, if there is no contest begun in a court or no recount, he shall burn the envelopes without opening them or examining their contents.

"(2) The registrar shall file the envelopes or packages containing the precinct registers, certificates of registration, pollbooks, tally sheets, and oaths of election officers. He shall keep them unopened until the commissioners meet to canvass the returns. The commissioners shall open the envelopes or packages.

"(3) Immediately after the returns are canvassed, the registrar shall file the pollbooks, election records, and the papers delivered to the commissioners."

"23-4008. Disposition of items in event of contest. If there is a contest within twelve (12) months, the registrar shall keep the envelopes or packages unopened until the contest is finally determined and then destroy them. If the court has custody of the envelopes or packages as evidence, they are in the custody of the court and the registrar shall not destroy them."

There is no dispute that the issue before the Court is an election contest. Did the proposed constitution pass or fail? This contest was filed in this Court and the above cited statutes explicitly and implicitly grant the Court the authority to compel

- 39 -

a reexamination of the original canvass in order to determine the exact number of votes, both gross and net, that were cast "for" or "against" the proposed constitution.

We recognize the argument that the time for a recount has expired. However, the legislature has provided exact instructions by which a recount may be held, and this Court readily submits to those instructions.

The legislature has provided for the retention of ballots for a period of 12 months in the event a dispute may arise as to the exact outcome of a given election. This is the case at hand, therefore, the requisite power and means exist for a recanvassing of the June 2, 1972, special election, in order to determine the exact number of electors voting "for" or "against" in that election.

A recanvass is not a new or unusual remedy. In State ex rel. Lynch v. Batani, 103 Mont 353, 362, 62 P.2d 565, we stated:

> "We think what the court said in the similar case of Capper v. Anderson, 88 Kan. 385, 128 Pac. 207, is applicable here.
>
> "There it was recorded: 'A canvassing board, in ascertaining and registering the effect of the returns, acts in a purely ministerial capacity, and is subject to control by mandamus. * * * The power to compel a canvass implies the power to compel a correct one. A ministerial duty wrongly performed is not performed at all. The correction of an erroneous computation can, of course, be compelled by a court. The mistakes here complained of are substantially of that character. They consist of treating the face of the poll books and tally sheets as indicating a result which a proper consideration of the entire document shows beyond a question to be wrong. Whatever might be the rule in a situation admitting of a substantial difference of opinion, when a court can determine with certainty that the poll books and tally sheets show a certain number of votes to have been cast and counted for a particular candidate, it can require a board of canvassers to give proper effect to that determination.'"

Case law from other jurisdictions supports the principle expressed in Lynch. The following cases stand for the single proposition that a board of canvassers can be reconvened to

correctly, accurately, and truly ascertain the result of an election. State v. Mills, 132 W.Va.580, 53 S.E.2d 416; Eaton v. County Court of Cabell County, 140 W.Va. 498, 85 S.E.2d 648; Kane v. Registrars of Voters of Fall River, 328 Mass. 511, 105 N.E.2d 212; Dotson v. Ritchie, 211 Ark. 789, 202 S.W.2d 603; Mahoney v. Board of Supervisors of Elections, 205 Md. 325, 108 A.2d 143; State v. County Court of Logan County, 145 W.Va. 581, 116 S.E.2d 125; and State v. Mercer County Court, 129 W.Va. 584, 41 S.E.2d 855. The list is endless, but the simple proposition exists that this Court has the power through the statutes heretofore cited, and the means, through the granting of a writ, to order a recanvass of the precincts of Montana to determine the total number voting at the special election on the proposed constitution.

We would order the Secretary of State to immediately take action by issuing instructions to the fifty-six county clerk and recorders in Montana to conduct a recanvass by precinct to balance the poll books with the valid ballots to determine the total number of electors voting at the special election.

In filing the foregoing dissent, we recognize the futility of it. By a three to two vote this Court is declaring a new constitution to have been adopted. We believe the/opinion majority to be wrong; and therefore dissent.

We are aware that under our proposed solution a recanvass might reveal the same result; that is, that it would show a majority of those voting at the election did approve. If that were to occur, we would be satisfied.

_____
Chief Justice

_____
Associate Justice.

- 41 -